# Leonard's Appeal.

To surcharge a guardian with a certain fund on the ground that in not collecting it he was guilty of negligence, it must be shown not only that he had the legal right, but was subject to the legal duty to collect it in his official capacity.

June 15th 1880.    Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

Appeal from the Orphans' Court of *Clearfield county :* Of May Term 1880, No. 160.

Appeal by J. T. Leonard from the decree of the court confirming the report of the auditor appointed to report upon the *exceptions* filed to the account of appellant, as guardian of Kate F. Moore.

The facts as found by the auditor Wm. M. McCullough, Esq., were as follows :

" William L. Moore died in 1864, and James A. Moore, his son, and Hannah Moore, his widow, became his administrators on 22d July 1864.    Kate Moore, and her sister Mary, were the only children not of age, and on December 4th 1866, James T. Leonard, who was a brother of Hannah Moore, the widow, became their guardian by an appointment which directed a bond to be filed, in each case, in $12,000.

" The real estate of the decedent consisted of a tract of timber land which was sold in 1868 (the interest of the minors being divested by a sale.made by their guardian under authority of the Orphans' Court), and a number of lots of land in the borough of Clearfield, and pieces of land adjoining and in the vicinity of the borough.    On June 22d 1868, a petition for partition, signed by the heirs of age and the guardian for the two minors, was presented to the court, and, in accordance 'with its prayer, certain persons were appointed to make partition.    These persons, by a report which was confirmed September 30th 1868, divided the property into certain purparts, and appraised the same at $12,420.    On June 25th 1869, James T. Leonard, as guardian, petitioned the court for an order authorizing him to make private sale of his wards' interests

[Leonard's Appeal.]

in the real estate appraised, setting forth that the said real estate was unproductive, and that it was to the interests of the wards to sell it, and that it would sell for a better price at a private than public sale, upon which the court ordered the guardian to sell either at public or private sale as he might deem most advantageous, and to give a bond in $3000 with security. On October 4th 1869, the bond of James T. Leonard, with James A. Moore as surety, was filed, the condition of which reads : ' That James T. Leonard, guardian of Catharine Moore and Mary Moore, minor children of W. L. Moore, shall faithfully appropriate the proceeds of sale,' etc., the name of Catharine Moore being erased as shown here. On September 30th 1869, return of sale to James A. Moore and Hannah Moore of the interest of Mary Moore, being one fifth, for $2000, confirmed by the court. The order of sale made on 25th June 1869, directed that the purchase-money be secured by bond and mortgage and bear interest from the day of sale. The guardian having learned that Kate Moore, one of his wards, arrived at full age, stated to the administrator, James A. Moore, that she could join in the deed with her elder sisters, Mrs. McCullough and Mrs. Showers ; accordingly a deed, which bears date the 19th June 1869, was executed by them making over their interest to the administrator, James A. Moore and Hannah Moore. Kate Moore became of age on March 21st 1869. She testifies that the deed was brought to her by her brother, James A. Moore, he stating that Judge Leonard said she should sign it. She says she knew there were some business being transacted relative to the property, but did not know that she had anything to do with it until then. The guardian denies that he gave any direction that she should execute the deed, but did say to James A. Moore that she could join with the others, when he learned she was of age. She testifies that the deed was not opened in full, but only two folds of it, so that she could sign it. The purchase-money was settled by James A. Moore giving his note payable to the two older sisters and to ' Jas. T. Leonard for Kate Moore,' each in $2000. These notes, Moore testifies, were drawn up in this way with the knowledge and consent, and, he thinks, by the direction of James T. Leonard, and the time for payment was fixed to suit him. The notes were drawn in Leonard's bank, is the recollection of Moore, and Leonard says he thinks they were drawn in his office. When filled out and signed they were taken by Moore to Leonard, who enclosed the notes of Mrs. Showers and Mrs. McCullough, and took the note of Kate Moore. He states that he objected to taking it, but this is denied by Moore, who states that he took it without objection, and it is not alleged by Leonard that he ever showed this note to Kate Moore, or that she ever knew that any note had been taken for her interest, until about the time this proceeding began. On the other hand she testifies that she always supposed she was getting what her two sisters older than herself got, and it

was shown that they were paid within a few months after the sale, by Leonard. James A. Moore testifies that after delivering the note to Leonard he told Kate Moore that Leonard had her money, and never knew or was told that he did not intend to pay it until about the time this proceeding began, and after he had made over to Leonard all his title to his real estate. James A. Moore testifies that the purchase of this real estate was made after frequent consultations with Leonard, and that Leonard had agreed to pay the purchase-money to these heirs. Leonard denies that he was consulted about the purchase, but states that he told James A. Moore the price was too high, and admits that he did agree to pay Mrs. Showers and Mrs. McCullough's notes. It appears by Leonard's testimony that James A. Moore owed him largely in 1869, and up to the present time has continued in his debt, although he admits that no liens were against Moore until about March 1877. By deed of 24th June 1878, Leonard acquired title to all of James A. Moore's real estate, being the real estate purchased by him of Kate Moore and others in 1869. Besides this, it appears that the guardian had advanced $3000 to James A. Moore, which had been expended in improving this property by clearing a portion and building houses. It was not proven and not even alleged that Kate Moore was ever informed by the guardian of the situation of her estate, or of his dealings in relation to it. On the contrary, the latest payments to her by her guardian were the largest, and the payments seem to have all stopped suddenly. The only intimation proven in the testimony of the guardian was that, when she (the ward) came for money, he told her that there was no more money coming to her, that 'Jim had her money.' The testimony shows that the guardian and the administrator, James A. Moore, were on close terms, and that the latter's circumstances were best known, and probably only known, by the guardian. The guardian continued to act as guardian after the ward came of age. Indeed, his account shows that all the payments made to her by him were after she attained her majority, and the guardian's account as kept in his books shows the $1000 purchase-money for the timber land credited to her on December 22d 1869, nine months after she came of age, and his own testimony is, that that was the time he received the money. As to the $2000 for the other real estate, it was taken by him after she was of age, payable to him for her, and the existence of the note was not made known to her."

The auditor then reported:

"From this state of facts, your auditor is at a loss to know why the guardian should not be held to pay the Kate Moore note. It is a most singular circumstance, incompatible with the plainest duty and most sacred obligation of a guardian to his ward, that he should make himself liable for two notes payable to parties in whom he had no interest, and permit the estate of his ward to be frittered away to

[Leonard's Appeal.]

an irresponsible party, taking a note therefor that he swears is not worth the paper it is written on. No matter whether she was of age or not. He knew all about her estate and all about the parties buying it. He had never been discharged as her guardian by settling up her estate and handing it over to her, and while she looked to him and trusted in him as her guardian, it was his plain duty to protect her interest. The facts before stated show that the title to the very land for which this note in dispute was given, in a few years vested in James T. Leonard. Thus we have the singular business transaction of a guardian permitting the estate of his ward to pass into the hands of an irresponsible party, for worthless paper, and then entering liens against the purchaser and acquiring the title himself. The policy of the law as well as the plainest dictates of humanity, demand that guardians be held to a strict accountability for the honest performance of their duties and faithful discharge of the sacred trust committed to them.

"As a matter of law it was contended by the counsel for the guardian that Kate Moore, having arrived at her majority before the deed was made, and having signed it herself, her guardian was in no way liable for the payment of this note. On the other hand it was maintained by the counsel for the exceptant that the guardian, having continued to act in that capacity for his ward, after her majority, and never having filed his final account of his ward's estate and got his discharge from the court, that therefore he was liable, and numerous cases, both in this country and in England, were cited in support of this position, which it is unnecessary for your auditor particularly to refer to. It is sufficient to say that after a careful consideration of all the authorities, and under the facts in this case, he is well satisfied of the correctness of this position.

"The exceptions to the account are therefore sustained."

Leonard filed exceptions to this report, but the court overruled them and confirmed the report. From this decree this appeal was taken.

*McEnally & McCurdy*, for appellant.—If a guardian acts for his ward in transactions arising after the ward is of age it is not by virtue of his office of guardian but by virtue of the authority given him to do so by his former ward. Such a transaction is no guardianship matter, but is to be treated in the same way as any other transaction under the same circumstances between parties who are legally competent to act for themselves. Transactions between guardian and ward which arise or originate during the ward's minority, or which belong to such transactions, are alone subjects of settlement in a guardianship account.

If Leonard is liable on the $2000 note it must be on the ground, that, having received it he did not collect it. Leonard denies his liability. The whole transaction is on and after the 19th of June

1869, after the relation of guardian and ward was at an end. It does not belong to his guardianship account. The question of his liability cannot properly be tried here. On that question he is entitled to a hearing and trial in the ordinary course of legal proceedings.

*Murray & Gordon*, for appellee.—The proposition we rely on is, that where a guardian neglects to settle with his ward, and fails to inform her of the situation of her estate in his hands, and continues to act negligently as guardian, after she comes of age, he is liable to account as such for the whole time., This is so from the nature of the relation, and the very necessity of the case. After age, the relation of confidence continues as before, enabling the guardian to profit thereby, and the deprivation of the information and knowledge respecting the ward's estate, which if possessed by her might awaken information and jealousy on her part, continue as before. So also the loss of the benefit which might accrue from the control and use of her property.

Mr. Justice GREEN delivered the opinion of the court, October 4th 1880.

The only question in this case is, whether the appellant should be surcharged as guardian of Catharine F. Moore, with a particular sum of money, for which the auditor and the court below held him liable to account. The plain facts were that the ward, after she attained her majority, sold her interest in certain real estate of which she was a tenant in common with her sisters and brother, for $2000, and executed a deed therefor to the purchasers, who were her mother and brother. With this sale the guardian had nothing to do. The ward being examined, testified as follows: "My brother James brought the deed for me to sign about ten years ago. I was twenty-one years of age at that time. * * * Judge Leonard had never spoken to me about signing the deed. Leonard was not there at the time it was signed. It was signed at my home; no one present but my brother and myself. Judge Leonard never mentioned the deed to me since. He never talked to me about my interest in the estate. He never mentioned the deed to me before I signed it—at the time, or afterwards. I never took any advice from any one about signing the deed except my brother, James A. Moore. I simply want to say that I took advice from no person." Judge Leonard testified: "I was not present when the deed was made from Kate to her brother James, and knew nothing about it. She never consulted me about making such deed, nor any of the others. I never advised her to make such a deed." The purchase-money was not paid in cash. One of the purchasers, the brother, drew up and signed a note for $2000, which he made payable " to the order of James T. Leonard, for Kate Moore, for

her interest, as per deed given for the real estate of her father." The note was taken by Moore to Leonard, who testified: "I did'nt know how they were settling. Kate's note was brought to me afterwards, on the same day, by James A. Moore. No one else came to me in regard to that matter. Don't know exactly what he said or what I said; but I told him I would not take the note, that it was not worth the paper it was written on. He said, 'then take it and keep it.' I said I would do that awhile. He never came back for it, nor any one else. He never asked me to pay it, and I never agreed to pay it."

James A. Moore testified when examined in chief, that Leonard promised to pay the purchase-money which the several notes represented, but on cross-examination said that Leonard left the impression on his mind that he would pay this note—"said he would hold it or take care of it: don't mind the words." The notes given to Kate's sisters, were endorsed by Leonard, and delivered by Moore to them, and were subsequently paid by Leonard. The note for Kate's share of the purchase-money Leonard refused to endorse. Whether in this state of facts Leonard became liable, in his individual capacity, to pay this note or the money it represented, either on the ground that in receiving and holding the note he was acting as his ward's agent, and was guilty of negligence in not collecting it, or on the ground of his alleged promise to pay it, is a question which is not before us, and which, therefore, it is not necessary to decide. But whether he is liable in his capacity as guardian, to be surcharged with this amount, is an entirely different question, and one which, in our opinion, is quite free of difficulty. It is, as it must be, asked, to charge him with the money, on the ground that he ought to have collected it and did not, in other words, that he was guilty of negligence in not performing his official duty in respect to this fund. The position would be well taken if he had the legal right, or was subject to a legal duty, to collect the money in his official capacity. But it is too plain for argument that he never had such a right, and was never subject to such a duty. He did not sell the land as guardian or in any other capacity. The purchase-money was never due to him as guardian, and he could never have maintained any action or proceeding, at law or in equity, to collect the money in that capacity. Nor was he subject to any kind of duty as guardian to collect it. Now the very essence of the application to surcharge is official negligence. But there can be no such negligence where there is no official duty. How can a guardian be held liable for not doing that which he could not lawfully do at all? He could never have brought an action on this note in his capacity as guardian. The transaction in which the note was given originated after the relation had ceased. Moreover, it was made with the ward herself after she had become *sui juris*. *She* was then chargeable with the duty of look-

[Leonard's Appeal.]

ing after, and caring for, her own interests.   It was *her* duty and right to receive the purchase-money, or an equivalent security, when she delivered the deed, and the omission to do so was *her* negligence and not the appellant's.   To visit the consequences of that negligence upon one who was subject to no duty and had no legal right in the premises, would be doing gross injustice to him, and we cannot sanction such a proceeding.   The cases cited for the appellee have no application to the facts of this case.   Of course if a guardian actually receives money of his ward after the majority of the latter, and in the assumed capacity of guardian and before accounting, he must account for it in his subsequent settlement. But that is not this case.   Neither does the fact that he received and paid over money due on the note for $1000 taken from A. K. Wright after the relation ceased, at all affect the case.   That note was given to the appellant as guardian during the pendency of the relation and for property of the ward sold by him under an order of court.   He was liable for it, and whether he received the money during or after the pendency of the relation was immaterial, as. he was bound to and did account for it.   Neither does the guardian's long delay in filing his account at all affect the present question.   Such delay can not operate to subject him to charges to which he is neither legally nor equitably liable.

We are of opinion that the auditor and court below were in error in surcharging the appellant with the sum of $2000, the amount of the note of James A. Moore, dated June 1st 1869, and the interest thereon, and the decree of the court below. is therefore reversed.

> Decree reversed, with direction to the Orphans' Court to correct the report of the auditor by striking therefrom the charge of $2000 for the note of James A. Moore, and all interest allowed thereon, and also by striking out the item of $87.50 costs, charged to James P. Leonard.   The costs of this appeal to be paid by the appellee.